

# In the Missouri Court of Appeals
## Eastern District

### DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED106921 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of |
| | ) | of St. Francois County |
| vs. | ) | 16SF-CR01351 |
| | ) | |
| JOSEPH A. SCHELSKY, JR., | ) | Honorable Wendy Wexler Horn |
| | ) | |
| Appellant. | ) | Filed: November 12, 2019 |

### OPINION

Joseph Schelsky appeals the judgment of the Circuit Court of St. Francois County entered after a jury found him guilty of three counts of first-degree assault of a law enforcement officer, one count of first-degree robbery, four counts of armed criminal action, and one count of attempted escape from custody. All of Schelsky's convictions, except for attempted escape from custody, stem from two separate traffic stops which occurred on the same day, August 30, 2016, and during which Schelsky threatened law enforcement with a firearm. During the first stop, Schelsky swiftly exited his vehicle, surprised the lone police officer present by running toward him before he could exit his patrol vehicle, and stuck his pistol beneath the officer's left arm before he could draw his own weapon. Schelsky then took the officer's taser at gunpoint and fled. About twelve hours later, after he was stopped again, Schelsky drew and aimed his pistol at two police detectives for nearly a minute during a standoff before surrendering.

On appeal, Schelsky challenges the sufficiency of the evidence to support his convictions of first-degree assault and armed criminal action for threatening the two detectives during the second stop. He also challenges the trial court's jurisdiction in this case—asserting that the indictment was invalid because it bore a recused judge's signature—and contends that two of the State's witnesses gave opinion testimony that invaded the province of the jury. As to these points, we find no reversible error, and accordingly we affirm all of Schelsky's convictions except for attempted escape from custody.

With respect to that conviction, however, Schelsky points out—and the State concedes—that the conviction cannot stand where the alleged escape attempt occurred while he was no longer in *custody* but had already been delivered to a place of *confinement*, negating an essential element of the charged offense. *See State v. Rickman*, 23 S.W.3d 914, 914 (Mo.App.S.D. 2000) (citing §§ 556.061 and 575.200, defining "custody" and the offense of "escape from custody," respectively, for the principle that a person is not in custody when he has already been delivered to a place of confinement, and holding therefore that the defendant in confinement did not escape from custody). Accordingly, we affirm in part and reverse and remand in part.

**Background**

At approximately 7 a.m. on August 30, 2016, Officer Jacob Sitton of the Desloge, Missouri Police Department was driving his patrol vehicle in downtown Desloge when he encountered Schelsky driving a black Pontiac Trans Am with a broken taillight. Officer Sitton decided to follow the vehicle because he noticed Schelsky was not paying attention to the road, and because he learned upon checking the vehicle's registration that it was registered to a driver with a suspended license, Garrett Williams, whom Officer Sitton assumed was driving the vehicle.

2

While following the vehicle, Officer Sitton observed Schelsky make an illegal left turn at a stop sign. As Officer Sitton attempted to position his patrol vehicle to effect a traffic stop, Schelsky drove away at a "high rate of speed." Officer Sitton activated his emergency lights and siren and pursued Schelsky. Officer Sitton observed Schelsky fail to stop at two stop signs on his way to Old Highway 8, a road leading out of town.

When Officer Sitton closed in on Schelsky on Old Highway 8, Schelsky left the highway, swerved into a private driveway, and ran into a fish pond in front of a residence. Officer Sitton "nosed" his patrol vehicle toward Schelsky's driver's side door and Schelsky made eye contact with him. Suddenly, Schelsky attempted to drive away again, but he quickly lost control and drove nose first into a ditch beside the highway. Officer Sitton positioned his patrol vehicle directly behind Schelsky so he could not back out onto Old Highway 8.

Officer Sitton emerged from his patrol vehicle after alerting dispatch about the situation. By that time, however, Schelsky had already exited the Pontiac and was running toward Officer Sitton from approximately ten to 15 feet away. Officer Sitton ordered Schelsky to get on the ground but he kept running toward the officer. Officer Sitton testified that when Schelsky was approximately seven to ten feet away, "his right hand [came] up, and he had a silver, small framed pistol in his hand." Officer Sitton attempted to draw his own weapon but did not have enough time to do so. Schelsky stuck his pistol into Officer Sitton's body beneath his left arm and, while maintaining the pistol in that position, told the officer to stop trying to draw his own weapon.

As Officer Sitton attempted to convince Schelsky not to shoot him, Schelsky with his free hand turned off the officer's radio and took his taser from his belt. Officer Sitton testified that once Schelsky had the taser out, "it appeared that he was looking at the taser trying to figure out how to operate it." Officer Sitton believed that Schelsky was going to use the taser on him. He

3

testified he feared for his life, so he continued to attempt to convince Schelsky not to harm him. Eventually, Schelsky ordered Officer Sitton to return to his patrol vehicle and drive away, which he did. Schelsky kept Officer Sitton's taser and it was later found in a wooded area nearby.

Approximately twelve hours after his assault on Officer Sitton, Schelsky encountered Detectives Kenneth Wakefield and Matthew Wampler of the St. Francois County Sheriff's Department at a second traffic stop. The stop was the result of the detectives' plan to apprehend Schelsky that they had arranged with an unidentified informant who gave them a tip several hours after the first traffic stop that Schelsky remained near Old Highway 8. The informant agreed to pick up Schelsky while a cell phone in his truck allowed the detectives to listen in as they followed in their patrol vehicle, and he agreed that when the truck reached a particular location where other officers were waiting to provide backup, the detectives would activate their emergency lights, the informant would stop his truck, and law enforcement would apprehend Schelsky.

When, as planned, the detectives activated their lights and the informant came to a stop outside Desloge near Old Highway 8, Schelsky exited the vehicle from the passenger's side door and aimed his pistol at both Det. Wakefield and Det. Wampler. The two detectives exited their patrol vehicle parked approximately 20 to 30 feet behind the truck, pointed their guns at Schelsky, and ordered him to drop his pistol. Both detectives testified that they repeatedly "pleaded" with Schelsky to put the pistol down, but that he did not comply. Det. Wampler testified that the standoff lasted between 45 seconds and one minute; that Schelsky did not speak but moved the barrel of his gun from one detective to the other; and that his finger was in the trigger guard. Det. Wakefield testified that the detectives "immediately identified" themselves as law enforcement and told Schelsky to "drop the gun," but he refused. Det. Wakefield also testified that when Schelsky aimed his pistol at the two detectives, he believed based on his extensive experience as

4

a law enforcement officer and on his knowledge of Schelsky's earlier assault on Officer Sitton, that Schelsky had the intent to kill him or cause him serious physical harm.

After nearly a minute, Schelsky dropped his pistol into the bed of the truck in which he had been riding. The gun remained within arm's reach, however, and when the detectives approached Schelsky to subdue him, he struggled with them before they could place him under arrest. A bullet was found in the chamber of the pistol Schelsky aimed at the detectives and additional bullets were found in the gun's magazine.

Subsequently, Schelsky was interviewed by Officer Brad Judge at the Desloge Police Department. Schelsky admitted that he "put [his] gun to Officer Sitton's rib" at the first stop, and that he knew prior to the first traffic stop that there was an outstanding warrant for his arrest. Also, Schelsky later testified that he recognized before the second stop that the police believed he was "armed and dangerous" because he had already "pulled a gun on an officer."

Following his interview with Officer Judge, Schelsky was delivered to the St. Francois County jail. At trial, the State presented considerable evidence that while he was confined in the jail, Schelsky attempted to escape by directing a female acquaintance, Michelle Dessieux, to bring weapons to him.

Based on the foregoing facts, the jury found Schelsky guilty of three counts of first-degree assault of a law enforcement officer for threatening the officers at the two traffic stops, one count of first-degree robbery for stealing Officer Sitton's taser, four associated counts of armed criminal action, and one count of attempted escape from custody.

Schelsky was sentenced to 20 years in prison for each count of first-degree assault of a law enforcement officer, ten years for first-degree robbery and for each count of armed criminal action,

5

and two years for attempted escape from custody. The sentences were ordered to run consecutively for a total of 112 years in prison.

This appeal follows.

## Discussion

1. *The trial court did not lack jurisdiction in this case, and the indictment was not invalid, because § 545.030.1(18) provides that no indictment shall be deemed invalid, nor shall the trial or judgment be in any manner affected, where—as here—the indictment bore no defect or imperfection that prejudiced the substantial rights of the defendant on the merits.*

Schelsky argues that the indictment here was insufficient to charge a crime because it bore the signature of a recused judge. On this basis, he challenges the trial court's jurisdiction and asserts plain error. We find, however, that the indictment was sufficient under § 545.030.[1]

The indictment at issue was a superseding grand jury indictment filed to add to the original indictment the count of attempted escape from custody. Before the superseding grand jury indictment was filed, Judge Sandy Martinez, who signed the original indictment, recused pursuant to a motion for change of judge, and the case was assigned to Judge Wendy Wexler Horn. Nevertheless, Judge Martinez signed the superseding indictment, and Schelsky was tried thereon with no objection until this appeal, where he asserts for the first time that the indictment was invalid and deprived the trial court of jurisdiction.

Section 545.030.1(18) sets forth in pertinent part that "[n]o indictment . . . shall be deemed invalid, nor shall the trial [or] judgment [be] in any manner affected" as the result of any "defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits." Notably, this provision is subject only to the interpretive dictate that it shall not be

---

[1] All statutory references are to RSMo 2012 unless otherwise stated.

6

"construed as to render valid any indictment which does not fully inform the defendant of the offense of which he stands charged." § 545.030.2.

Moreover, in line with § 545.030, our cases hold that "when the issue is raised for the first time after verdict, the indictment or information will be deemed insufficient only if it is so defective that (1) it does not by any reasonable construction charge the offense of which the defendant was convicted or (2) the substantial rights of the defendant to prepare a defense and plead former jeopardy in the event of acquittal are prejudiced." *Id.*

Here, we find Schelsky makes no credible showing of either of these two disjunctive grounds. There was no question Schelsky was fully informed of the offenses with which he was charged. He merely asserts that Judge Martinez's signature taints the entire proceedings despite the fact that the indictment was otherwise free of any defect or imperfection. As a result, we conclude that none of his substantial rights to prepare a defense was affected.

Furthermore, the signature of the recused judge did not deprive the trial court of jurisdiction. "Subject matter jurisdiction of the circuit court and the sufficiency of the information or indictment are two distinct concepts." *State v. Parkhurst*, 845 S.W.2d 31, 34-35 (Mo.banc 1992). "Circuit courts obviously have subject matter jurisdiction to try crimes," *id.* at 35 (citing Mo. CONST. art. V, § 14(a)), and "[c]ases stating that jurisdiction is dependent upon the sufficiency of the indictment or information mix separate questions" and "should not be relied on." *Id.* (citing *Montgomery v. State*, 454 S.W.2d 571, 575 (Mo.banc 1970)). Additionally, there can be no issue of personal jurisdiction on appeal where such was waived by appearing and defending without objection. *Id.* (citing *State v. Conway*, 171 S.W.2d 677, 683 (Mo.banc 1943)). Therefore, we find no plain error here.

7

2. *Sufficient evidence was presented to support Schelsky's convictions of first-degree assault of a law enforcement officer and armed criminal action committed against the two detectives at the second traffic stop.*

We review a challenge to the sufficiency of the evidence to determine whether there was evidence in the record from which a reasonable juror could have found each element of the crime beyond a reasonable doubt. *State v. Ajak*, 543 S.W.3d 43, 46 (Mo.banc 2018). We do not reweigh the evidence but accept as true all evidence tending to prove guilt and all reasonable inferences supporting the verdict. *Id.* Furthermore, we ignore all contrary evidence and inferences, although we will not supply missing evidence or grant the State any unreasonable, speculative, or forced inferences. *Id.*

Under § 565.081.1, a person commits the crime of first-degree assault of a law enforcement officer if "he attempts to kill or knowingly causes or attempts to cause serious physical injury to a law enforcement officer." *Fisher v. State*, 359 S.W.3d 113, 121 (Mo.App.W.D. 2011). In light of this definition, the focus of Schelsky's sufficiency challenge here is whether there was substantial evidence that when he aimed his pistol for nearly a minute at the two detectives at the second traffic stop, he had the intent to and attempted to cause them serious physical injury. Schelsky's sufficiency challenge to his armed criminal action convictions is entirely bound up with this question, as well, since he does not assert that the State failed to meet any element of those offenses except that he did not commit the underlying felonies.

To attempt to cause serious physical injury, the defendant must take a substantial step toward achieving a purpose to do so. *State v. Ransburg*, 504 S.W.3d 721, 723 (Mo.banc 2016) (citing § 564.011). A "substantial step" is "conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." *State v. Withrow*, 8 S.W.3d 75, 78 (Mo.banc 1999) (citing § 564.011). "Serious physical injury" is "physical injury that creates a

substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." *Fisher*, 359 S.W.3d at 121 (citing § 565.002(6)).

The defendant's intent to cause harm is, for its part, rarely susceptible of proof by direct evidence, and is most often inferred circumstantially. *State v. Lammers*, 479 S.W.3d 624, 632 (Mo.banc 2016). Indeed, our cases hold that the defendant's mental state may be determined from evidence of the defendant's conduct before the act, from the act itself, and from the defendant's subsequent conduct. *Ransburg*, 504 S.W.3d at 723.

Considering such evidence here, we find there were sufficient facts presented to demonstrate that Schelsky attempted to inflict serious physical injury on the detectives at the second traffic stop. Schelsky concedes on appeal that the evidence showed he raised his pistol and pointed it toward the two detectives "for a matter of seconds, possibly up to a minute," after he exited the vehicle in which he had been riding. There was also evidence including testimony from the two detectives that while they immediately identified themselves as law enforcement and ordered Schelsky to drop his weapon, he did not comply but kept the gun trained on them for a sustained period; that during the standoff, Schelsky placed his finger on the trigger guard of the pistol; and that when he finally dropped his weapon, he did not place it out of arm's reach and struggled with the detectives as they attempted to subdue him. Finally, Schelsky told the jury himself that he recognized before the second stop that the police believed he was "armed and dangerous" because he had already, at the first stop, "pulled a gun on an officer."

Viewing this evidence in the light most favorable to the State, we believe a juror could reasonably have concluded that Schelsky displayed a serious intent to kill or inflict serious physical harm on the officers, and that although he did not fire his pistol, he did take a substantial step

9

toward causing grave harm by placing his finger on the trigger guard and keeping his pistol pointed at the two detectives at the second traffic stop even as they ordered him to drop his weapon.

The jury need not have relied on the additional facts Schelsky emphasizes—that he made no verbal threats, did not advance toward the officers, and did not flee—because it had the right to disbelieve all or any part of the evidence and refuse to draw Schelsky's preferred inferences. *State v. Jackson*, 433 S.W.3d 390, 399 (Mo.banc 2014). Also, the jury was not precluded from finding that Schelsky committed first-degree assault even though there was no evidence that he pulled the trigger or caused injury. *See Lammers*, 479 S.W.3d at 636 ("To the extent that [Missouri cases] hold that threats with a deadly weapon with the ability to carry them out cannot constitute attempt unless the defendant pulls the trigger, police intervene, or the defendant causes only minor injury, those decisions should no longer be followed."); *id.* at 635 ("[O]nce a substantial step has been taken, abandonment comes too late to avoid liability.").

For all these reasons, we find Schelsky's sufficiency challenge fails.

3. *No manifest injustice resulted from the admission of Officer Brad Judge's testimony that Schelsky claims invaded the province of the jury.*

At trial, the State played a video recording of and adduced testimony from Officer Brad Judge about Schelsky's interview following his arrest. The recording showed that during the interview, Officer Judge told Schelsky he did not think Schelsky meant to hurt Officer Sitton at the first traffic stop. On direct examination, the State asked Officer Judge whether he "truly believed" what he said to Schelsky when he said it. He responded, "Absolutely not." The State asked him, then, to explain his statement made to Schelsky during the interview.

Before Officer Judge could answer, Schelsky objected on relevance grounds. The objection was overruled, however, and Officer Judge was permitted to give the following testimony explaining his statement to Schelsky during the interview:

10

Every school I've been to, they taught me that you've got to get the person talking. It's a heated situation that everybody just came out of. If I went in there and said, hey, you just tried to kill my best friend, he's not going to sit down and talk to me. I mean, it's not going to happen.

I know when you stick a gun in someone's side, you're planning to kill them. I have had to draw my weapon and point it at somebody. My intentions were to kill that person. And thank God, you know, things changed where I was able to retreat and not do it. You don't point a gun at somebody you're not going to kill.

On appeal, Schelsky contends that Officer Judge's testimony invaded the province of the jury when he commented, "I know when you stick a gun in someone's side, you're planning to kill them," and, "You don't point a gun at somebody you're not going to kill." He argues that these portions of Officer Judge's testimony were inadmissible because they inserted the opinions of a lay witness on a matter reserved exclusively for the jury—the ultimate issue whether, when Schelsky aimed his pistol at law enforcement officers at the two traffic stops, he had the requisite mental state to commit the first-degree assaults he was charged with and convicted of here.

Schelsky concedes that he failed to preserve this point by neglecting to include it in his motion for new trial, and he requests plain error review of the trial court's ruling. We have the authority and discretion to review plain errors affecting substantial rights if we determine that manifest injustice or miscarriage of justice has occurred. *State v. McCleary*, 423 S.W.3d 888, 896 (Mo.App.E.D. 2014) (citing Rule 30.20). Plain error is error that is evident, obvious, and clear, and we determine whether such errors exist based on the facts and circumstances of each case. *Id.* (citing *State v. Moore*, 411 S.W.3d 848, 858 (Mo.App.E.D. 2013)). The alleged error must have a decisive effect on the jury's determination. *Id.* (citing *Moore*, 411 S.W.3d at 858); *State v. Walter*, 479 S.W.3d 118, 124 (Mo.banc 2016). We will find a decisive effect if there exists a reasonable probability the verdict would have been different but for the alleged error. *McCleary*, 423 S.W.3d at 896 (citing *Moore*, 411 S.W.3d at 858).

11

The plain error rule is to be applied sparingly and does not justify review of every point that has not been properly preserved. *Id.* (citing *State v. Irby*, 254 S.W.3d 181, 192 (Mo.App.E.D. 2008)). Plain error review involves a two-step analysis. *Id.* The first step is to determine whether the asserted claim of plain error *facially* establishes substantial grounds to believe that a manifest injustice or miscarriage of justice has occurred. *Id.* If facially substantial grounds are found to exist, we then move to the second step of the analysis, and engage in plain error review to determine whether manifest injustice or a miscarriage of justice *actually occurred.* *Id.*

Turning to the merits of Schelsky's claim of plain error here, we note a lay witness may not testify regarding the witness's opinion on a matter in dispute because the lay witness lacks specialized knowledge about the matter and, therefore, the jury and lay witness are in equal positions to form an accurate opinion. *State v. Ferguson*, 568 S.W.3d 533, 540 (Mo.App.E.D. 2019) (citing *State v. Presberry*, 128 S.W.3d 80, 86 (Mo.App.E.D. 2003)). Put another way, a "lay witness may not give an opinion when it has the effect of answering the ultimate issue the jury is to determine." *Id.* (citing *State v. Cason*, 596 S.W.2d 436, 440 (Mo.banc 1980)).

In light of these principles, we find Schelsky's claim of plain error meets his facial burden to justify plain error review. Our cases hold that, in general, neither a lay nor an expert witness may testify regarding the paramount issue of whether the defendant had the requisite mental state to commit a charged offense. *See, e.g., State v. Clements*, 789 S.W.2d 101, 110 (Mo.App.S.D. 1990) ("Dr. Harte was not an expert, however, on the paramount issue of whether, at the time of the homicide, defendant in fact deliberated. The determination of that issue was within the capability of lay jurors. Deliberation was an ultimate issue for the jury alone under appropriate instructions."). And given how Officer Judge's challenged testimony was likely to be construed on this record, we believe Schelsky is correct that Officer Judge was permitted to state opinions

12

on one of the ultimate issues here: whether Schelsky had the intent to kill or seriously injure the law enforcement officers at the two traffic stops when he aimed his pistol at them. Contrary to the State's arguments, this was not an issue on which Officer Judge could be considered an expert, and no lay witness should have been permitted to testify on it either, because it was an ultimate issue reserved exclusively for the jury under the appropriate instructions. *Clements*, 789 S.W.3d at 110; *see also State v. Pickens*, 332 S.W.3d 303, 322 (Mo.App.E.D. 2011) ("An expert may not intrude upon the jury's right to draw inferences and conclusions from the facts of the case.").

Nevertheless, here like in *McCleary*, 423 S.W.3d at 897, we find that although Schelsky's asserted claim of plain error facially establishes substantial grounds to believe that manifest injustice or a miscarriage of justice has occurred, given the particular circumstances of this case, we cannot conclude that any manifest injustice or miscarriage of justice actually occurred. Trial court error must have a decisive effect on the outcome of the proceedings to amount to manifest injustice or a miscarriage of justice. *State v. Walter*, 479 S.W.3d 118, 124 (Mo.banc 2016); *McCleary*, 423 S.W.3d at 896. And here, for multiple reasons, we find the admission of Officer Judge's testimony did not have a decisive effect on the jury's determination—i.e., no reasonable probability exists the verdict would have been different but for the alleged error. *Id.*

First, the other evidence of Schelsky's guilt was overwhelming. On this record, there was considerable properly-admitted evidence—some of which we have already discussed above, in addressing Schelsky's sufficiency challenge—to establish that Schelsky attempted to cause the law enforcement officers at the two traffic stops in this case serious physical injury when he aimed his pistol at each of them. While Schelsky maintains that his actions were unerringly law-abiding and meant only to protect his own life, we find that the totality of the evidence—including Schelsky's own admission to Officer Judge that he put his gun "to Officer Sitton's rib" even though

13

he knew there was an outstanding warrant for his arrest, Schelsky's concession on appeal that he pointed his pistol at the two detectives at the second stop for nearly a minute, and the firsthand accounts of Officer Sitton and Detectives Kenneth Wakefield and Matthew Wampler of how Schelsky made them fear for their lives—demonstrates rather that Schelsky exhibited such brazenly persistent defiance of law enforcement that his hostility toward them and the threat of grave harm he posed to them could scarcely be doubted. Furthermore, Officer Judge's testimony about Schelsky's intent, in particular, was not emphasized. In closing argument, the State did not mention it, but rather cited the testimony of other witnesses to evince that Schelsky had the requisite intent to commit the assaults here.

For these reasons, we find this record is substantially similar to that in *McCleary*, 423 S.W.3d at 897-98 (finding no manifest injustice or miscarriage of justice resulted where there was overwhelming evidence of the defendant's guilt and the erroneously-admitted evidence "was not overemphasized"), and we therefore deny Schelsky's claim of plain error in the admission of Officer Judge's testimony.

4. *The trial court did not err by admitting the testimony of Det. Wakefield that Schelsky claims invaded the province of the jury.*

The State also adduced the testimony of Det. Kenneth Wakefield that when Schelsky aimed his pistol at the two detectives at the second traffic stop, he believed that Schelsky intended to kill him or cause him serious physical harm. Schelsky contends that this testimony invaded the province of the jury in the same manner that Officer Judge's testimony did. We find, however, that Det. Wakefield's testimony, unlike Officer Judge's comments, did not insert an inadmissible opinion about Schelsky's criminal intent, but rather constituted an admissible recollection by the detective of his mental impressions from when Schelsky threatened him with a firearm.

The relevant portion of the direct examination of Det. Wakefield is as follows:

14

THE STATE: And when you first saw Mr. Schelsky what was he doing?

DET. WAKEFIELD: Mr. Schelsky came out of the passenger's side of the truck. He came up with a firearm in his hands, and he immediately took aim on my partner, Detective-Sergeant Matthew Wampler.

THE STATE: Okay. And at some point did he aim the gun at you?

DET. WAKEFIELD: He did.

THE STATE: How far were you from him when he did so?

DET. WAKEFIELD: I'm going to say I was 25, maybe 30 feet.

THE STATE: As far away as I am from you?

DET. WAKEFIELD: In that vicinity, yes, sir.

THE STATE: Okay. And you saw the gun, and it was pointed at you?

DET. WAKEFIELD: Yes, sir.

THE STATE: And how did you respond?

DET. WAKEFIELD: I withdrew my duty weapon, and I pointed it at him.

THE STATE: Okay. And did there follow a stand-off?

DET. WAKEFIELD: Let me correct myself, sir.

THE STATE: Okay.

. . .

DET. WAKEFIELD: I not only pointed it at him. I took aim at him.

THE STATE: Okay. And were you and Detective Wampler yelling at Mr. Schelsky?

DET. WAKEFIELD: Yes, sir.

THE STATE: And what were you saying?

DET. WAKEFIELD: We immediately identified ourselves as police. Told him to drop the gun.

15

| | |
|---|---|
| THE STATE: | Now, at this moment did his gun remain on you? |
| DET. WAKEFIELD: | It did. |
| THE STATE: | And was there any question in your mind at this moment that the defendant intended to kill you or cause you— |

[Schelsky then objected before Det. Wakefield could answer, asserting that this was a "jury question." But the objection was overruled.]

| | |
|---|---|
| THE STATE: | Was there any question in your mind at this time that this defendant intended to kill or cause you serious physical injury based on his actions? |
| DET. WAKEFIELD: | There was no doubt about that, or I would not have taken aim on him, sir. |

As with Officer Judge's testimony, Schelsky concedes that he failed to preserve his objection to Det. Wakefield's testimony because he did not include it in his motion for new trial. Accordingly, he requests plain error review.

On this point, however, we find Schelsky fails to meet his facial burden to justify plain error review, since the record shows that Det. Wakefield's testimony was an admissible recollection and not an inadmissible opinion on an ultimate issue. Although a lay witness is usually precluded from offering opinions, he or she may testify about facts within his or her personal knowledge. *Urbach v. Okonite Co.*, 514 S.W.3d 653, 660 (Mo.App.E.D. 2017) (citing *State v. Sanders*, 842 S.W.2d 916, 919 (Mo.App.E.D. 1992)); *see also Patton v. May Dept. Stores Co.*, 762 S.W.2d 38, 42 (Mo.banc 1988) (citing *Travelers Indemnity Co. v. Woods*, 663 S.W.2d 392, 399 (Mo.App.S.D. 1983)) ("Generally, witnesses must state facts from which the jurors are to form their opinion, but when a witness has personally observed events, he may testify to his matter of fact comprehension of what he has seen in a descriptive manner which is actually a conclusion, opinion or inference, if the inference is common and accords with ordinary experiences of

16

everyday life."). Moreover, the admission of testimony relating personal observations and impressions, even if they involve an interpretation of the basic facts observed, may be justified by the witness's extensive law enforcement experience. *See State v. Battle*, 415 S.W.3d 783, 788 (Mo.App.E.D. 2013) (citing *State v. Davidson*, 242 S.W.3d 409, 414 (Mo.App.E.D. 2007) (holding based on the principles stated above that testimony of a law enforcement officer was admissible that it is uncommon to see bruising thirty minutes after an incident of abuse and that bruises usually do not appear until the following day).

Here, Det. Wakefield possessed several decades of relevant law enforcement experience to testify to his comprehension based on facts within his personal knowledge of the threat Schelsky posed to him and Det. Wampler in the standoff at the second traffic stop. Furthermore, unlike with Officer Judge's testimony, here there was no risk that the jury was equally capable of reaching the same conclusions as the witness, because the jury was not capable of concluding for itself what Det. Wakefield's thoughts actually were during the standoff, without hearing him recollect such. Finally, Det. Wakefield did not state any broad opinion like Officer Judge's that was untethered to any personal observation of the standoff in this case that when one person aims a gun at another person, they intend to kill or seriously harm the targeted individual. Therefore, we find Det. Wakefield did not render an inadmissible opinion that invaded the province of the jury.

5. *Schelsky's conviction of attempted escape from custody must be vacated because the alleged escape attempt occurred while he was no longer in custody but had already been delivered to a place of confinement.*

We turn finally to the sole instance of reversible error that we find occurred in this case. Here, as in *State v. Rickman*, 23 S.W.3d 914, 915 (Mo.App.S.D. 2000), "[t]he state concedes the merit of defendant's appeal acknowledging that because he was confined when he [allegedly

17

attempted escape], having already been delivered to a place of confinement, he did not escape 'from custody' in violation of § 575.200."

In relevant part, § 575.200 provides that "[a] person commits the offense of escape from custody or attempted escape from custody if, *while being held in custody* after arrest for any crime, he or she escapes or attempts to escape from custody." (emphasis added). A person is in "custody," as defined by § 556.061(17), "when he or she has been arrested but has *not* been *delivered to a place of confinement*." (emphasis added). A "place of confinement," for its part, is "any building or facility and the grounds thereof wherein a court is legally authorized to order that a person charged with or convicted of a crime be held." § 556.061(37).

Turning to the facts of this case, we note Schelsky was delivered to the St. Francois County jail following his arrest at the second traffic stop. Critically, at no point prior to Schelsky's delivery to the jail did he attempt to escape being held. And while the State presented considerable proof that following his delivery to that place of confinement, he attempted to escape by directing another person to bring weapons to the jail, here the State charged Schelsky with attempted escape from *custody*, as opposed to attempted escape from *confinement*.

Consequently, here like in *Rickman*, although "[t]he evidence [may] have supported a conviction of escape from confinement in violation of § 575.210.1," because defendant was not charged with or convicted of that offense, Schelsky's conviction of attempted escape from custody must be vacated on due process grounds. *See id.* (citing *State v. Brown*, 950 S.W.2d 930, 931 (Mo.App.E.D. 1997)) ("Due process requires that a defendant cannot be charged with one offense and be convicted of another."). Therefore we reverse and remand with respect to that conviction.

18

## Conclusion

The judgment is affirmed as to all convictions except for attempted escape from custody. As to that count, alone, the judgment is reversed and remanded, with the trial court directed to enter a judgment of not guilty like in *Rickman*. 23 S.W.3d at 915 ("The judgment is reversed. The case is remanded. The trial court is directed to enter judgment of not guilty of the offense of escape from custody in violation of § 575.200.1.").

James M. Dowd, Presiding Judge

Colleen Dolan, C.J., and
Robin Ransom, J., concur.

19